In the United States District Court

For the District Court of Maryland

HD

Rcv'd by:

USDC- BALTIMORE
'25 OCT 23 PM3:32

Andrea Dwyer

5815 Whipoorwil Dr.

Deale MD 20751

Plaintiff

V.

Civil Action No.

JRR 25 CV 3492

State of Maryland, Maryland Department of Health

201 W. Preston Street, Baltimore, MD 20201

David Cherry, former Deputy Director Federal Services

Patricia Nay, MD Former Executive Director OHCQ

2132 Beallsville Rd. Dickerson, MD 20842

Fran Phillip, Former Deputy Director MDoH

2526 Carrollton Rd. , Annapolis MD, 21403

Defendants

## I. Background:

1. In all times pertinent to these events the Plaintiff was the CEO (Chief Executive Officer) and the NHA (Nursing Home Administrator-Licensee) of record, as such the legal party liable for the skilled facilities (SF) regulatory compliance as demanded by C&S (Congressional and State) regulations.

2. In March of 2020, as the global PHE (Public Health Emergency) (Covid-19) began to be knowingly discovered as present in Maryland the Licensee sought access to testing for patients living in SFs, understanding that clinical studies were evidencing that the frail disabled elderly population especially those living in congregate housing would be the most likely to suffer significant health consequences if infected by Covid-19. This made directions from the MDH (Maryland Department of Health), that "patients living in SFs be given last priority of access to testing for Covid-19", alarming at best.

3. Licensee had already expressed other concerns with MDH and OHCQ (Office of Healthcare Quality) the shortcomings in managing the PHE in SFs:1. lack of available PPE (Personal Protective Equipment) and failed directives to use face masks/procedural surgical mask as opposed to the knowingly necessary N-95s, 2. SF's being denied access to previous CMPs (Civil Money Penalties) funds to buy PPE 3. Seeking SF(s) continue to admit new patients including Covid+ while in outbreak and 4. of course the limitations of testing made available to patients in

SFs. These concerns were noted loudly and publicly by the Licensee and in a meeting with LDH (Local Department of Health) in mid-March 2020.

4. By late March into early April, SFs were informed by MDH they were not ALLOWED to test patients independent of the Maryland state lab, and that even then they could only test patients already symptomatic and transmitting the virus. Meanwhile the general public was lining up by tens of thousands to test at drive-through sites.

5. On March 12, 2020, Licensee went to the office of LDH and explained succinctly that if the SF was not given permission and assistance to UNIVERSALLY test the SF's patients to determine a baseline, then the Licensee would be forced to load up all 12 buses, readily identifiable as the SF's buses, and drive thru through the testing center, in full view of the media, and if asked why such actions were necessary, to explain the limitations of testing being directed to SFs. The Licensee in under 24 hrs. was granted permission and achieved the significant necessary testing supplies and lab services from a newly contracted and MDH approved private lab.

6. Licensee continued to rally against the erred policies of MDH and then began to attract media attention. The SF received accolades, on national news for testing outside of government directions, a path later adopted by MDH, CDC (Centers for Disease Control), and CMS (Centers for Medicare and Medicaid). As a result of Licensee's criticism, the MDH under the agency OHCQ and later BENHA (Board of Nursing Home Examiners, Maryland State) retaliated against the Licensee, entering the SF without probable cause (per their own evidentiary documents and testimony), with the goal to seek and make a determination of IJ (Immediate Jeopardy) for the sole-purpose of publicly publishing "observations" as failures of regulatory

compliance in an effort to silence Licensee's free speech and retaliate for dissent against the government during a PHE.

7. On April 2, 2020, Licensee presented a plan to the local county health department to test all facility residents for COVID. On 4/6/2020, SF initiated collection of universal testing of asymptomatic patients- 146 tests in all. On or about this time, the License made an AP release for all SFs to have access to test asymptomatic patients living in NHs.

8. On several occasions during this period Mike Ricci, then Governor Larry Hogan's Director of Communications, was repeatedly publicly tweeting about this particular SF above the other 242 SFs in the state in mid-April of 2020 and the 120 other SF in known Covid outbreak. Prior to the SA's entry one of Mike Ricci's tweets mis-stated information about the SF resulting Mr. Ricci's later retracted erred information.

9. The inspection of SFs, while a necessary government function, is not a government tool for retribution. On 4/21/2020, the SA entered the SF at 6:40 pm to initiate an investigation specifically for regulatory non-compliance that could be determined as an Immediate Jeopardy (IJ). The SA selectively distinctly choosing this SF out of 120 other SFs publicly known to be in Covid "outbreak". The SA completed no other inspections of any of the other 242 SF in Maryland for an additional 60 days, and only then after pubic pressure from CMS. On 4/21 at 6:45 as the SA entered to "investigate for multiple complaints" an allegation that was not factual, evidencing no probable cause to enter the SF. The SA had NO complaints much less multiples, in fact the only complaint the SA had to gain the required permission from CMS to enter the SF, is that which the SA themselves fabricated, a complaint against the Licensee stating she did not respond timely to requests of the SA. The SA goes further in its complaint to CMS by targeting the Licensee as incompetent to manage the SF during the PHE. The SA actively concealed their

fraudulent actions by correctly stating in the public facing published SOD the report, alleging Licensee was non- responsive to request for five days, was received correctly and timely on 4/17. This evidencing the SA attempts to conceal their fraud. The fraud was not discovered until additional discovery after the OAH when the "actual report" the SA sent to CMS was later revealed as withheld from the OAH case.

10. On 5/6/2020 and 5/7/2020 a conference call was scheduled for the attendees: then General Counsel for Governor Hogan Mike Perdone, Maryland State Attorney General Counsel Kathleen Ellis, then Asst. Director of the Maryland Department of Health Fran Phillip, and then Director of Office of Health Care Quality (SA) Patricia Nay. Clearly, is it unlikely Mr. Perdone or Ms. Phillip is qualified as a CMS regulatory inspector. It is easily argued Mr. Perdone's presence was to assure the SA were not defaming the organization or Licensee? The following individuals did meet and review matters involving the NOD, SOD, SF, and Licensee and releasing such unrequested charging documents (NOD/SOD) to the AP/WP.

11. On 5/7 and 5/8, the SA's charging documents (NOD & SOD) against the Licensee and SF were released by MDH (Patricia Nay, ED) without request by media and in defiance of directives by C&S mandates for required review and comment period by the Licensee of 14 days prior to any public release. Instead without any request the charging documents were released to the *Washington Post* and the *Associated Press*. The Licensee, in horror, read the allegations in the Washington Post along with the rest of the general public. The charging documents (3rd SOD version 7/2020) was later appealed via a very prescriptive and required process, i.e. IDR, IIDR, an OAH hearing and finally a Circuit Court.

12. On 4/29/2020 and 5/1/2020 the SA team notified the Licensee; they had again conferred with the home office about determining an IJ non-compliance findings and it was agreed that MDH

staff were calling another IJ for the F880 federal register. Charges and fines exceeded statutory and congressional mandates for assesses and assigning CMPs, and without explanation when asked in OAH. (citation X2)

13. On 6/2020, only after the Licensee filed an appeal of the charging documents The SA outside of directions in SOM revised the SOD, the changes targeting the Licensee directly by adding Administration (F835) as regulatory non-compliance, made up solely from cut and paste allegations and observation(s) already categorized in other citing's.

14. In July 2020, the MDH staff revised the SOD yet again, deleting a nominal tag for medical records. The unstated and unknown reason was made clear, the SA was concealing conflicting statements of allegations made in order to more closely target the Licensee with a "known system failure", receipt of 146 labs over two days with no tracking mechanism and no system.

15. Left Blank Intentionally

16. Licensee attended and testified at the OAH four-day evidentiary hearing in 12/2020, the proposed OAH decision was docketed in 4/2021, and the state appealed in 9/2021. The case was heard de novo in Charles County Circuit Court in 8/2022 affirmed the resounding and only win by a SF in the state of Maryland and order of such was docketed in 10/2022.

FN: Notably, the case proceeded, outside of the rules of procedure, even though the then MDH Director Denise Schrader refused to sign the appeal. Having been named in a similar lawsuit filed in 2017 against MDH might well be the explanation of Mr. Schrader's unwillingness to sign the appealed filed by his own agency.

17. A DAB (Departmental Appeal Board) hearing was held in 5/2022. The case remains in appeals.

## II. JURISDICTION AND PARTIES:

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Licensee's causes of action arise under the Constitution and laws of the United States and the state of Maryland. The Court has authority to issue declaratory, injunctive, and equitable relief.

18. State of Maryland, Maryland Department of Health the agency that was required to maintain control and oversight during the PHE and the agency required to maintain control and oversight of the Office of Health Care Quality and the agency contractual obligated to such among other requirements of the of Rules of Participation and federal demands of OBRA.

19. *"The authority having jurisdiction is the person or persons who have the authority to make a final determination of noncompliance and are responsible for signing the correspondence notifying the facility of the adverse action."* The SA identified this individual to be Dr. Patricia Nay, then Executive Director at the Office of Health Care Quality under Maryland Department of Health.

20. Fran Phillip as the then Depuy Director of the Maryland Department of Health and the person directly engaged in the review of the SOD and NOD prior to unrequested public release of the charging documents.

21. David Cherry the then Deputy Director of Federal Services at the Office of HealthCare Quality, being directly involved in fabricating, falsifying, concealing lack of probable cause.

## III. Cause of Action and Jury Demand:

22. The SA did knowingly and willfully with reckless disregard and malice retaliate against Licensee's clearly established right under the constitution. Licensee's First Amendment Right to Free Speech and criticism of the government. Licensee's right to receive due process both

substantive and procedural is a Constitutional right under the 5th amendment and the 14th amendment for state's. (counts 1 &2)

23. The defendants named and unnamed did abuse the power of the regulatory investigative process. The defendants did employ Malicious Prosecution (count 3) and Abuse of Process (count 4) in spite of known evidence and facts on the record. Further the record is clear that David Cherry, Fran Philip and Patricia Nay named Defendants did actively conspire against the rights of the Licensee. The SA both as holders of required state board licensure themselves and by training as SA understand the reporting requirements once a Licensee is charged with Immediate Jeopardy. The SA did therefore tortiously interfere with business relations (count 5) in committing fraud by concealment and omissions and threatening with licensure actions while actively planning to defame the licensee in the Associate Press and Washington Post. The SA knew the Licensee's relationship with CMS under the contracts known as the Rules of Participation and OBRA require the Licensee as the liable Managing Party and such attacks would cause harm. The SA also is well aware such charging documents, especially publicized, would interfere with the Licensee business relationship with her licensing board, and the business community. The SA did abuse the regulatory process while conspiring against the civil rights (count 6) of the Licensee.

24. Because each of the named defendants was an official of the state of Maryland at the relevant time. Further that each defendant was acting under the color of state law, therefore this element of the Licensee's claim is not in dispute and the court must find this element has been established.

25. Intentionally Left Blank

26. Plaintiff demands a jury trial on all triable issues.

## IV. Harm

27. A declaration that Defendants' actions violated Licensee's fifth amendment due process rights and order appropriate relief, A declaration that Defendants' actions violated Licensee's first amendment and order appropriate relief; Grant such other relief as the Court may deem just and proper. No one would question the obvious and overt harm had the government simply taken money directly from a citizen's account or stripped a citizen of home ownership by force. Nothing less are these civil rights violations by means of publicly defaming and abusing a process to knowingly and maliciously pursue the Licensee. The loss of income, community, and professional goodwill, the loss of retirement savings, the inability to gain meaningful employment in a professional arena, are no less damaging, as intended by the SA. The financial harm is quantifiable and for a jury's determination as fact finders.

28. Having been publicly identified as so incompetent at Licensee's career as to have caused the deaths of 29 frail and vulnerable patients placed Licensee professionally and within her community in status of just above pedophile.

## V. Failed Duties of the SA

29. SF oversight and enforcement programs are administered under extensive laws, regulations, operation manuals, and other guidelines. Surveys and the documentation from surveys become an important part of subsequent legal proceedings arising out of the certification process. The State Operations Manual (SOM) is a federal document published by the Centers for Medicare & Medicaid Services (CMS) that provides the official rules, guidelines, and procedures for survey and certification of healthcare facilities. The SOM serves as a comprehensive guide for state

survey agencies to conduct compliance audits and provides healthcare providers with the necessary policies and regulations to maintain their certifications under Medicare and Medicaid programs. "Immediate jeopardy" exists when "the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. (FN: State agencies designate the scope and severity level using a matrix published in the State Operations Manual, ch. 7, § 7400.3.1 (Rev. 185, eff. Nov. 16, 2018), available at https://www.cms.gov/regulations-and guidance/guidance/manuals/downloads/som107c07pdf.pdf. Scope and severity levels of A, B, or C are deficiencies for which CMS cannot impose enforcement remedies. Scope and severity levels of D, E, or F are deficiencies that present no actual harm, but have the potential for more than minimal harm that do not amount to immediate jeopardy. Scope and severity levels of G, H, or I are deficiencies that involve actual harm that do not amount to immediate jeopardy. Scope and severity levels of J, K, and L are deficiencies that constitute immediate jeopardy to resident health or safety.)

30. SA failed to utilize the CMS directed TIC survey to investigate regulatory compliance for infection control at SFs. The SA never produced evidence of such after repeated request of the Maryland Attorney General.

31. The SA failed to follow the required directions: CMS Transmittal QIS-19-09-All Direction to SA How to write an IJ template, transmittal on Calling IJ.pdf .

32.SA failed in their stated duty made known via the SOM "*Citations must relate to the statutory or regulatory requirements. The evidence must provide the underlying reason, basis or rationale for the findings of noncompliance with the regulatory requirement(s). The determination of compliance, as well as noncompliance must be based on objective, factual observations and not vague conclusions. The ROP citation includes ONLY those requirements that must be corrected to achieve compliance with the ROP.* The directives are clear that noncompliance is to be cited for regulations, not standards of care based on personal opinions of individual or even collective SA members. The SA repeats in testimony they did not agree with the MDH epidemiologist giving CDC directives weekly to SF. They SA repeatedly testified many "observations" in the

SOD were known to them at the time of their authorship of the charging documents (SOD) to not be regulatory deficiencies, but in their opinion violations of SOC.

33. SA failed, "*If the deficiency results from a lack of documentation, make sure the documentation is requested from the staff member who might or who should know where the documentation can be found.*" In court proceedings the SA, perjurers itself, while simultaneously attesting to their failures of gaining required documentation to support the deficiency, stating they never received or retrieved the paper copy of R4 lab results from either the SF, lab, or LDH, testifying contrary to evidence (given numerous documented requests from the SA for information) the SA requested and never received R4's lab.

34. The SA is required to be trained to understand the responsibility of evidentiary materials: *The SA Documentation on the Form CMS-2567 remains the key element in the record to support a determination to certify compliance or noncompliance with applicable requirements and, if necessary, to defend the determination before the public, during the appeals process, or in court.* The SA would have been aware falsifying probable cause to initiate a survey was a violation of their duties. The SA would have understood presenting to the courts as they did MDH exhibit 4 and misdating as pre survey guidance from CDC as opposed to more than two months post survey CDC updated guidance that would violate the SA's duties. The most evidenced reckless disregard for the rights of the Licensee can be found in F770 IJ determination not a single allegation from the IJ template remained by the time of the third SOD. The now allegations in need of justification as the necessary causative factor for the IJ, likelihood of harm, becomes the confession of the NHA. As such F770 represents clearly the SA's inability to determine what was necessary to achieve their determination of regulatory non-compliance.

35. "*Although a comprehensive statement may contain facts illustrating deficiencies at multiple tags, surveyors may not simply copy and paste from one tag to another*" This is the exact failure of duty performed by the SA in their overt actions to target and threaten the Licensee in creating the cut and paste allegation made up in F835 Administration.

36. IJ… Immediacy of corrective action requirement(s) of notice is noted 76 times in only 22 pages of SOM Appendix Q instructions to SA on determining and documenting an IJ. "*These situations must be accurately identified by surveyors, thoroughly investigated, and resolved by the entity as quickly as possible.*" SOM Q. Yet this SA purports these observations of regulatory failures, "likely to cause immediate harm" were not recognizable or of such "immediacy" to warrant notifying the Licensee for an additional 11 days after the SA witnessed such life-threatening observations (4/21, 4/23) and waited till 5/1/2020 (after calling an IJ on 4/29/2020) for such determination of an IJ for F880/Infection Control requiring immediacy of action, is implausible at best. More plausible and evidentiary is a large group of individuals at the SA combed through the SA's "notes of observations" to twist and fabricate such "observations" as falsely representing regulatory failures.

37. The SA and MDH is well versed in the requirement of APA courts. Required within the Administrative Procedure Courts an ALJ must render a decision based on the evidentiary record, which includes findings of fact and conclusions of law. 5 U.S.C. § 557(c) ("All decisions . . . shall include a statement of . . . findings and conclusions, and the reasons or basis therefore, on all the material issues of fact, law, or discretion presented on the record."); 42 C.F.R. § 498.74(a). The SA failed to produce the necessary evidentiary record to sustain the knowing false allegations against the Licensee/SF. The resoundingly winning OAH MDH OHCQ 44-20-155515.

38. The SA fails to respond, on 3/20/2020, MDH FAQ advised against wearing face masks unless infected and showing symptoms or was a healthcare worker caring for someone with Covid 19 in a close setting. Around this time, the Licensee emailed Dr. P Nay without a response regarding the best PPE for source control, i.e. N-95s, to no response

39. The SA fails when on 4/29/2020 the MDH continued to require NHs to admit COVID+ residents, but NH residents remained a low priority for testing. The SA while satisfied with charging CMPs, and defaming HCPs (Health Care Professionals) already under threat, the SA NEVER asked the SF to cease admitting patients. In fact, it was the SF/Licensee that self-elected to place a ban on admission(s) in the testing period and outbreak.

40. Left Intentionally Blank

**VI. Collective Overt Acts of Reckless Disregard and Malice:**

41. These identified failures by the SA required collaboration, as a dictated CMS process, to the SA. "*When the surveyor/survey team determines an IJ the survey team must consult with their State Agency (SA) for confirmation that IJ exists, and seek direction. When ...IJ exists, the survey team must immediately: Notify the administrator...that IJ has been identified and provide a copy of the completed IJ template to the entity; and request a written IJ removal plan, which is the immediate action(s) the entity will take to address the noncompliance that resulted in or made serious injury, serious harm, serious impairment, or death likely.*" Anyone of the SA staff involved in the SA's inspection could have prevented this reckless attack on the SF and Licensee. It required collective efforts to remain actively ignorant of the CDC guidance, known science of novel virus, and actual regulatory guidance.

42. SA violates the charging scheme for COMAR 10.07.02.72 A and B(1) and attempts to conceal such egregious actions. The knowing overcharging of CMPs was a repeated theme for the SA of abusing the clearly prescriptive requirement of calculating charges. The CMP charging scheme violations were as follows: Charging for an event (3/30/2020 first positive patient not even at the SF but instead at the hospital) that had no effect of the purported deficiency The SA retro charges CMPs effective to 3/30/2020, with no reason or rationale for why as opposed to the reckless disregard and want to cause false light and appear punitive in up charged fines.

43.Delaying a revisit in 2020 until 165 days had passed to cause additional daily fines and harm to the SF of $165,000. SA's clear lack of candor and attempt to conceal is documented in court testimony stating the SF was relieved of the continued CMPs for the IJ in July 2020. Such attempt to conceal facts is clearly evidenced in notice from SA informing the Licensee the CMP relief was not until October of 2020. This is further evidence of the intent and want to cause and make a show of maximum harm as punishment to SF and Licensee.

## VI. Material FACTS Known to the SA as part of the Investigation-

44. The Licensee had the SF APA attorney complete a PIA request after the SA refused to make further disclosure. The PIA request still failed to yield the T.I.C survey required to be utilized by the SA by CMS for the IFC inspection. The SA did no use the required T.I.C survey tool because such toll would have exonerated the Licensee/SF of the charges of SOC conflated as non-regulatory compliance. Such failures of compliance by the SA are evidence overt concealment.

45. Intentionally Blank

46. What is established via this long list of a very short period of the PHE material to this matter is a relatively short list of known and accepted scientific and clinical directives embraced by

CDC and their agencies as facts: Covid is asymptomatic, the infected are likely transmitting prior to symptoms, and transmission occurs via respiratory, coughing, sneezing, talking, and breathing. The infectious period for isolation is 7, 10, and then 14 days. When testing "patients" are quarantined in isolation for 14 days. These few simple and repeatedly refuted facts, as such still by the MDH SA, are central to understanding the very forward actions of the Licensee's actions.

47. No Testing for SF: On or about 3/15/2020, the Licensee had a private meeting with the Charles County Commissioner and Charles County Local Department of Health physician/Executive Director to discover the testing capacity available in the county and was informed they had exactly TWO tests and no other known access. (OAH ALJ). The SA continues on 3/23/2020, MDH advised to conserve PPE .... NHs need to keep admitting and re-admitting confirmed COVID +. On 3/26/2020, MDH issued guidance advising NHs against testing asymptomatic residents in NHs. The SA was aware on 3/19/2020 that MDH had issued guidance that nursing homes should continue to admit COVID-19-positive patients, staff with "low-level exposure", and asymptomatic should continue to work while wearing a cloth face covering, and **that prior approval would be required for ANY COVID testing.** On 4/29/2020 the MDH continued to require NHs to admit COVID+ residents, but NH residents remained a low priority for testing.

48. PPE: The SA feigned a lack of knowledge of conservation necessity for PPE (Person Protective Equipment) in spite of CDC issued guidance on 3/17/2020, the CDC issued the first guidance on conserving, reusing, and improvising substitutes for masks and gowns for HCP. On 3/27/2020 the CDC's MMWR warning of further PPE shortages due to disruptions in the supply chain. On 4/9/2020 the MDH issued guidance for gown conservation. The SA routinely testify in OAH they have no knowledge of PPE conservation edicts from MDH or CDC.

49. Respiratory Transmission: The SA was aware of the likelihood of respiratory contagion, as evidenced by February 1, 2020 CDC Health Update indicated that sustained person-to-person spread of COVID-19." On April 5, 2020, the Governor of Maryland issued an executive order: The basis for this executive order was that COVID-19 "spreads easily from person to person and may result in serious illness or death;" On 3/30/2020 this SF received its first supply of N-95s from MEMA to allow ALL staff to receive distribution on the necessary conservation of N-95s.

50. Left Blank Intentionally

**VII. The Malicious and Reckless Disregard of the Charging Documents (NOD and SOD):**

51. Licensee/ SF was charged as follows for regulatory non-compliance which were causative factors of the harm to the patients at the SF. **Care Plans:** http://mdrules.elaws.us/comar/10.07.02.60 and/or https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-G/part-483/subpart-B/section-483.21 **Labs:** http://mdrules.elaws.us/comar/10.07.02.28 and/or https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-G/part-483/subpart-B/section-483.50 **Medical Records:** http://mdrules.elaws.us/comar/10.07.02.32 and/or https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-G/part-483/subpart-B/section-483.20 **Infection Control:** http://mdrules.elaws.us/comar/10.07.02.33 and/or https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-G/part-483/subpart-B/section-483.80 and later **Administration:** http://mdrules.elaws.us/comar/10.07.02.09 and/or https://www.law.cornell.edu/cfr/text/42/483.70

52. The Charging Documents, with referral to MFCU and Licensee's licensure Board was produced in the Washinton Post and linked in national publications from Texas to Montana to Maryland.

**VIII. The following statement(S) were published and prosecuted as fact when they were known to not be factual "timely knowing" is evidenced by two court records:**

53. The SA did knowingly falsely publicize, charge, and prosecute based non-factual statements: *"A COVID-19 Focused Infection Control Survey was conducted at this facility on April 21 2020 -May 6, 2020, by the Office of Health Care Quality to investigate complaints MDOOI 53513, MD00153415, and MD00153370."* Complaint-MD00153415 is wholly fabricated by the SA and the only reason the SA gains the necessary probable cause to initiate the investigation via CMS. The fabricated complaint of a necessary IJ level for entry to SF was: alleging the Licensee was untimely in response (greater than five days) and was is incompetent in managing Covid. The other two "alleged complaints" are received after the SA enter the SF.

54. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"and there were 9 residents included in the sample."* The SA reviewed medical records for 146 patients not a mere 9.

55. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"Survey activities consisted of a review of medical records, facility documentation, interviews with residents, staff, family members, and observations of resident and staff practices. Administrative reports and facility policies and procedures were also reviewed."* The SA spoke to no resident or family members.

56. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"The facility was not in substantial compliance with 42 CFR 5483.80 (Infection Control), Subpart-B-Requirements for Long Term Care Facilities. According to the facility's report submitted to the State Agency on 4/17/2020, the initial case of COVID-19 was reported on 3/30/20."* The SA knows the initial case of Covid dx in the SF was not until 4/6/2020, this knowingly non-factual statement becomes necessary for the SA to back-date the Civil Money Penalties (CMPs) and substantially increase the publicized punishment by overcharging CMPs. The SA further displayed its attempt at concealment by stating in the publicized charging documents (SOD) the "report from Licensee" was surrendered on 4/17/2020, as opposed to the SA's report to CMS falsely writing, the Licensee did not respond until five days after request. This is an documented evidenced attempt to conceal their fraud from Licensee, the public and the courts.

57. *"The facility was not following infection control safety practices and guidance recommended by the Centers for Medicare and Medicaid Services (CMS) and the Centers for Disease Control and Prevention (CDC), during a COVID-19 pandemic."* The SA themselves argue not non-compliance of regulations in legal proceedings, but instead some unknown undocumented standards of care (SOC).

58. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"This failure resulted in the exposure of COVID-19 negative residents to a resident with a positive COVID-19 diagnosis for 14 days."* The SA identifies this alleged "observation" of co-mingling patients regarding R4, no other patient. The SA conceals they know R4 never exited her room nor was there any allegation of observation by any surveyor of any Covid+ patient interacting with a Covid – patient, and staff never entered R4 room (or any patient room)

w/o full TBP (Transmission Based Precautions) from 4/6-4/20- the required quarantine period for testing. This, further evidence of SA's concealing their alleged observation occurred 4/23, more than 17 days after R4 testing and remaining asymptomatic and three days passed CDC's Symptom Based Recovery standard required of SF's. The published charging document fails to date a time (an intentional failure of the SA own duties) this as intended by the SA leading the reader to believe this "observation" occurred by the SA on 4/21.

59. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"COVID-19 (Coronavirus Disease 2019), is a disease caused by the coronavirus SARS -CoV-2. COVID-19 spreads from person to person, mainly through respiratory droplets produced when an infected person coughs or sneezes."* The SA made clear, only in legal proceedings, they know Covid is not transmitted via contact therefore not the likelihood of the means of transmission that could lead to harm and/or death as required by federal and state regulations for an Immediate Jeopardy determination. Further, the exact passage includes "Coughs, Sneezes or Breathes" as the risk, the SA removed the language "breathe" to create greater false light the SF and the Health Care Professionals are dirty and failing in BASIC compliance.

60.The SA did knowingly falsely author and cause to be published the following: *"This REQUIREMENT is not met as evidenced by: Based on record review and staff interview it was determined that the facility failed to develop and implement a comprehensive, resident-centered care plan..... facility staff failed to initiate monitoring for toxic effects of the antimalarial medication the resident had been started on."* This information does not belong in Care Plans and such would have been known to reasonably qualified SA. The monitoring of patients and the effect of Rx documentation would be and was in the nursing notes.

61. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"An interview with Licensed Practice Nurse (LPN) #23 on 5/11???2020 at 11:45 AM, revealed that staff had initiated monitoring of COVID-19 symptoms for residents who had been COVID-19 positive and started on the antimalarial medication. When asked if they monitored these residents for toxic effects of the medication, LPN #23 stated that they had not.* The SA know such is not required by Federal, State or SOC as part of Care Plans. The monitoring of patients and the effect of Rx documentation would be and was in the nursing notes.

62. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: "*An interview with the Director of Nursing (DON) on 5/1/2020 at 11 AM, revealed that the nursing staff were not initiating monitoring for toxic effects for residents who had been started on the antimalarial medication.* The SA know such is not required by Federal, State or SOC as part of Care Plans. The monitoring of patients and the effect of Rx documentation would be and was in the nursing notes.

63.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"Based on observation, review of resident medical records, and interview with facility staff, it was determined that the facility failed to properly prevent and/or contain COVID-19 when the facility failed to ensure an effective process was implemented to obtain and clinically respond to laboratory test results resulting in critical lab results neither obtained nor acted upon in a timely manner for Resident #4.*" The SA's only attempt to support this allegation in court is by falsely testifying "the system" used to track the incoming labs was ineffective, later arguing it was no system existed as confessed to by the Licensee.

64.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"The **first** COVID positive case in the building was 3/30/20 (*not fact patient in hospital-DX after being hospitalized for 4 days and was not R4*) and the testing for Resident #4 was collected on 4/6/20 but obtaining results was delayed for 14 days."* It is impossible to argue to any rational conclusion that one missed lab of 146 with resulting 40%+ positive had any effect on transmission or could have been a causative factor in an event that clearly occurred at minimum 6 weeks earlier.

65.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"This failure resulted in the exposure of COVID-19 negative residents to a resident with a positive COVID-19 diagnosis for 14 days."* SA intentionally omitted R4 was in isolation in a pvt. bedroom, with a pvt. bathroom, non-ambulatory and bed-bound and all staff in TBP. This this information was intentionally withheld with reckless disregard concealed from publication by the SA.

66.Blank Intentionally

67.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"According to the Centers for Disease Control (CDC) coronavirus (COVID-19) is a severe respiratory disease that spreads person to person."* The 2nd time in this document the SA acknowledges respiratory transmission not contact transmission is the known means of infection.

68.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"Resident #4's medical record was reviewed on **4/24/2020** at 11:33 AM. During the review, a nurse's note was found dated 4/6/2020 at 11 AM that stated, 'Per [Resident's Primary Physician], resident was tested for COVID-19 today. Results pending." The note was written by the Director of Nursing.* The EMR review first being recorded on 4/24/2020 reflects the SA did not receive the "complaint" of R4 until 4/22 (after entering the SF w/o probable cause)

completing the required IJ review within two days as required. However, begging the question why was the IJ not identified by the SA given the need for immediacy of correction. It takes the SA seven days after receipt, and five days after EMR review to make a determination of IJ. A failure of duty by the SA given the demand for immediacy.

69.The SA did knowingly falsely publicize, charge, and prosecute on non-factual statements: *"During an observation of the 300 Unit in the facility on 4/21/2020 at 6:45 PM. one room was observed on the 300 hallway with a posted sign indicating that transmission-based precautions should be used by any staff person entering that room. Observation on the unit also revealed that no other rooms had the same signage. The room with signage was not Resident #4's room."* The SA authors just three lines earlier stated no other rooms had signage? As later testified to by the SA, the sole reason R4 is not in isolation per the SA is lack of signage on R4's **exact door** on inspection. Such demand is a SOC not a regulatory requirement per the SA's testimony. The SA ignored and concealed repeatedly R4 was recovered from Covid by 4/21 and surely by 4/23 when SA states the actual door was witnessed with NO signage. They would know she was more than passed any infectious period as known to them, f by no other evidence of their own required knowledge then as evidenced by R4 son's "complaint", received by the SA on 4/24.

70.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"During this observation, the Administrator, the Director of Nursing (DON), and the Unit Manager of the 300 hallway were all present and indicated to the surveyors that there was* ***only one resident*** *who was being treated as COVID-19 positive on the 300 unit at that time, and identified them as the resident in the room with the isolation precaution sign. These* ***staff did not indicate Resident #4 was positive*** *at that time.* "The SA feigns more ignorance. The SA again conceals the date of this conversation, as that of 4/23, not the evening of 4/21 both dates yield the

same response because as repeatedly made known R4 is not C+ effective 4/20 per CDC/MDH she is no longer contagious and is SBR (symptom based recovered). Exactly as they were informed in the "complaint" from R4 son.

71.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: evidenced by their own authorship, the exception, the SA's written line three above this statement, point 113 *"The **OTHER** patient with the isolation sign" "It was further confirmed with the facility staff that the 300 hallway was designated for cohorting COVID-19 negative residents and that alt the other residents on the unit had tested negative for COVID-19."* (Again, except the one **OTHER** resident the SA noted at point 70)

72.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"During a 4/23/2020 interview at 10:30 AM, with the Administrator and the Director of Nursing (DON), both indicated that the facility had decided to have all residents in the facility tested for COVID-19 on 4/6/2020."* The SA is aware they had this information prior to entry and surely on the evening of entry 4/21/2020.

73.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements *"During an interview on 4/29/2020 at 6:30 PM, the Administrator indicated that the process that had been in use was that test results were received by nursing staff, and those nursing staff were then responsible for reporting the results to their unit managers," "...the residents' attending physicians, and to the resident's responsible parties. There was no process or system in place." to ensure that the facility received all results for all residents tested for COVID-19 on 4/6/2020.* The SA authors such knowing there are two forms of tracking forms for incoming labs, but argues 1 of 146 test being not noted timey for failing to be received for ten days, is the result not of a single human failure but of the ineffectiveness if the entire lab system.

The SA in 7/2020 SOD (3rd version) change their reasoning for determining regulatory non-compliance at an IJ: the Licensee confessed there "was no tracking system". Confession of such obvious negligence would cause significant concern for the Licensee's licensure agency (BENHA). This wild readily disprovable allegation despite evidence of a "list" daily since the SF exceeded requirements and self-reported to LDH on 3/30 of Covid tracking and testing using the MDH mandated form as accepted daily as such by both LDH and MDH, as required by Comar, is evidence of targeting and malice.

74.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements *"During an interview on 5/1/2020 at 9:45 AM, the Administrator indicated that the results from testing all residents in the facility on 4/6/2020 began to be sent to the facility from testing centers as early as 4/8/2020 and up to 4/11/2020. The Administrator indicated that she would verify those dates, however, final confirmation of those dates was never provided to the survey team prior to the survey exit."* This evidenced as not factual by the SA's own court presented evidence. It is yet another example of targeting the Licensee. The SA is aware there could be no regulatory deficiency in such statements. This is another "observation" for which the SA had no regulatory reason to comment except to give false light to Administrator being an incompetent.

75.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"After the test results for Resident #4 were received, he/she was still not relocated from the COVID negative unit for four more days, and the risk for spread of the potentially fatal illness within a vulnerable population continued."* **R4 never moved and she NEVER exposed anyone to Covid** and the SA feigning they do not know this is either reckless disregard or malicious. What it is not, is evidence of SA's competence.

76. The SA did knowingly falsely author and cause to be published a material omission authored by the Licensee detailed as submitted and accepted in the federally required Plan of Correction (POC) but omitted with the intention to conceal from public view in the Associated Press and Wahington Post releases **"patient R4 is more than 14 days past SBR recovery, in a private room, with private bathroom and all staff in TBP from 4/6-4/20/2020"**. This very definition of isolation per the CDC.

77.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements:

> *"-Immediate review of all residents tested for COVID-19 to ensure that no other resident's result was not entered into the medical record or communicated with the resident's responsible -A* ***master list*** *will be maintained by the director of nursing that documents when a resident is tested for COVID-19 and when the result becomes available. -The Director of Nursing and the infection Preventionist will be educated by the Administrator regarding this new process. -The Unit Managers will be educated by the DON that, upon testing of a resident for COVID-19, they will communicate that test to the DON so that an entry may be made into the* ***master list****. All lab test results will go straight to the DON who will enter the result into* the ***master list*** *at that time and communicate the result to the Unit Managers. -The DON will review the* ***master list*** *daily to monitor for delays in return of lab reports. The* ***master list*** *will be surrendered to the QAPI committee by the DON for review and adjustments as needed. This will happen monthly for three months."*

This evidentiary record exemplifies the reckless disregard and malice on display in SA's production of the SOD for public view. It is well documented the Licensee is responsible for the

POC- this is not the POC provided to the SA as written by the Licensee. In order to conceal facts on record the SA removed the pertinent and required POC 1. Patient condition: R4 was in in pvt. room pvt. bathroom and all entrants in TBP PPE. The SA further plagiarize the entry of master list five times; such was not authored by the Licensee and not part of the authored and accepted POC by the SA and CMS.

78. Blank Intentionally

79. The SA did falsify federal CDC documents to enter as evidence in court; MDH Exh. 4 was not produced as edited to represent as directions prior to the SA entering the SF in March of 2020, but instead on 6/3/2020 after the SA's citing of non-compliance.

80. Left Blank Intentionally

**VIII. Break down F880 and the POC**

81.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"Based on observation, record review, and staff interview, it was determined that the facility failed to properly prevent and/or contain COVID-19 evidenced by the failure to develop and implement an effective infection prevention and control program as evidenced by the following interrelated system failures. The facility failed to 1) implement appropriate isolation precautions timely; 2) keep infectious residents and non-infectious residents separated as much as possible during an infectious outbreak with a potentially fatal pathogen; 3) ensure that staff followed accepted standards of practice for hand hygiene during the declared health emergency; 4) ensure that staff utilized personal protective equipment in a manner the met minimum standards and minimized risk for infectious spread; and 5) develop and implement an effective system to both obtain and clinically respond timely to critical laboratory results. These*

*interrelated failures contributed to increased risk for harm and possible death to all residents, staff, and visitors during a declared health emergency."* The quickest answer to the multitude of ridiculousness in stating Licensee's failures caused Covid to spread is every observation of the SA cited as evidence of the root CAUSE OF THE LIKELIHOOD OF THE TRANMISSION OF COVID were at best contact precautions and not even violations of such. In short, how could staff not wearing gloves while at the nursing station (not providing patient care) cause Covid to spread? How could the Director of Nursing having dropped a personal bottle of hand sanitizer and had the nerve to pick it up and put it in her pocket, caused the Covid outbreak 8 weeks prior? To this day I wonder as opposed to what? Was the Director of Nursing to kick it down the hall, around the corner and up to lobby entry making a clean kick out the door? A GNA had one of her ties on her gown not tied was a causative factor? These are intentional failures, not of the Licensee or the SF's heroic employees but of the SA itself. Contact precautions are not the likely means of transmission for the Novel Covid-19 virus the means as noted as known in these documents is respiratory- not a single respiratory violation is ever alleged by the SA. Ms. Phillip wild have known all this as she had a month earlier publicly announced such transmission limitations as the Deputy Director of MDoH.

82.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: "1 .0 *The facility failed to implement appropriate isolation protocols timely. Multiple observations by the survey team revealed that areas where infectious residents were located were not sufficiently segregated in order to contain spread or further spread.* 1.1*Observation of Resident #1 's room on 4/21/2020 at 7:10 PM, revealed that a precaution sign was hung at the doorway. Medical record review revealed that Resident #1 was symptomatic. Nonetheless, the door to the room was open, but the resident was not wearing a mask. No station had been set up*

*for staff to safely put on and take off personal protective equipment.1.2Observation of Resident #2's room on 4/21/2020 at 7:11 PM, revealed that a precaution sign was hung at the doorway. The door to the room was open, but Resident #2 was not wearing a mask. No station had been set up for staff to safely put on and take off personal protective equipment.* "SA testifies to knowingly at the time of authorship conflating observations as regulations, that residents are not required/forced to wear a mask in their rooms, and that a trash can was inside this room at the time of the SA observation.

83.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"1.3 Review of a medical record on 4/22/2020 at 4:45 PM, revealed that Resident #2 developed a fever on 4/14/2020 and then a cough and shortness of breath on 4/15/2020. Despite the known outbreak that was evolving in the building, the resident's room door was left open for further monitoring. On 4/16/2020, the resident was tested for COVID-19 and results obtained on 4/21/2020 were positive. From 4/14/2020 onset of symptoms, staff did not institute or follow precautions to minimize the risk for spread from a symptomatic resident.*" The SA omits known evidentiary documented facts SF had tested on 4/6 universally testing protocols were widely published at that time as requiring isolation post-testing for 14 days. The SF had as known taken such action and isolated/quarantined all patients pending testing to their rooms from 4/6/2020-4/20/2020. This, further evidences the delay and failure by the SA of Immediacy required of both parties, 12 days for the SA to notify the Licensee/SF of these "observations' (4/21 & 4/23) requiring immediate correction. Last, this again evidences this EMR was performed before the IJ requiring immediacy of SA review before that of R4?

84.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *2.0 The facility failed to keep infectious residents and non-infectious residents*

*separated as much as possible during an infectious outbreak.* Never once has the SA offered an actual allegation of observation or any other purported examples of a Covid + patient interacting with a Covid - patient. A knowingly not factual ststement without any attempt of support.

85. *2.1 Upon entry into the facility on 4/21/2020 at 6:40 PM, the Nursing Home Administrator (NHA) and Director of Nursing (DON) were interviewed regarding the cohorting of residents. They reported that they had separate units for residents that were positive for COVID-19, and residents that were negative for COVID-19. However, observations during the survey revealed the cohorting was not consistently implemented. Observations of the 300 and 400 Units on 4/21 /2020 at 6:45 PM, revealed that there were COVID-19 positive residents that were allowed to remain on the otherwise negative units."* As evidenced the SA knew then the 400 unit was not established as negative but a PUI unit-(Person Under Investigation Unit- meant to have both likely C+/C- all in privately occupied isolation rooms, including R1 and R2 the SA further concealed by omission that "any" positive resident negative unit, R4 and R3 are each in private isolation rooms. This further evidence the SA's failures and the delay of "*Immediacy*" required of both parties, 12 days for the SA to notify the Licensee/SF of these "observations from 4/21 requiring immediate correction".

86.The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"2.2 In a 4/21/2020 interview with the Nursing Home Administrator at 7:00 PM, she indicated that the facility's 400 Unit had no residents that were COVID-19 positive. However, this was not accurate as there were two positive residents on this unit. In interview on 4/21/2020 at 7:06 PM, licensed practical nurse (LPN) #6 stated which two residents on the negative unit were positive. 2.3 In a 4/23/2020 interview at 8:25 AM, the Unit 400 Unit Manager indicated there was one COVID-19 positive resident on the unit. The Unit Manager indicated that the*

*family did not want the resident moved. An interview with the DON on 4/23/2020 corroborated this. The DON stated that due to the family and resident refusals they were not moving the resident. Under the declared health emergency, CMS issued blanket waivers entitled "Emergency Declaration Blanket Waivers" to allow facilities to move residents to protect everyone in the care environment. In a 5/1/2020 interview with the DON, she indicated she was not aware of the waivers in place during the health emergency. However, the facility NHA was aware of the CMS blanket waivers due to the NHA submitting a request to utilize facilities closed adult medical daycare center space for cohorting to the State Agency on 4/7/2020."*

Another example of random "observations" not related to regulations and again identifying the NHA for unknown reason. What regulatory or SOC is failed by the Administrator not knowing that 20 minutes prior residents had received newly tested lab results? This is evidence not of the Licensee's failures or of the SF's failures but the failure of the SA to follow their known duties. Are such demands made of Acute Care CEO's by the SA?

87. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"2.4 On 4/23/2020, more than two weeks after the 4/6/2020 testing, the facility still had not developed a working plan on how to manage resident cohorting as residents who tested positive recovered and cleared to negative status. In a 4/23/2020 interview, the DON stated that they had not yet developed a plan, but were working on developing one.* "No such regulation exists as known to the SA and conceded in testimony, the SA testified this was simply an observation they recorded, not a regulatory deficiency.

88. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"3.0 The facility failed to ensure that staff followed accepted standards of practice for hand hygiene during the declared health emergency. Surveyors made multiple observations*

*where facility staff members were not performing hand hygiene as necessary. For example: 3.1 On 4/23/2020 at 8:40 AM, registered nurse (RN) #22 was observed going into a resident room on the 300 Unit with medications. RN #22 was observed kneeling on the floor while administering medications to the resident in bed A. RN #22 exited the resident room carrying a medication container and sat the container onto the medication cart. RN #22 then removed the gloves she was wearing and pulled out a new pair and applied them without washing her hands. RN #22 then sanitized the new gloves with hand sanitizer. 3.2 On 4/23/2020 at 8:45 AM, surveyors observed two staff picking up trays on the 300 unit. A facility Social Worker was observed entering a resident room, picking up a tray and placing it on the cart. The Social Worker then did not wash her hands, but sanitized the same gloves and then entered the next room. During an interview, she stated she was not told to conserve gloves and was not told to sanitize them between residents. Following a different process, geriatric nursing assistant (GNA) #18 reported that she changed gloves and sanitized her hands before going to the next resident to pick up the tray. 3.3 Surveyors observed LPN #12 touching contact surfaces without gloves on 4/21/2020 3.4 Surveyors observed a facility Floor Tech touching contact surfaces without gloves on 4/23/2020 at 9:00 AM."* SA's failures of known duties, an observation conflated to appear as a regulation. These "observations" are conflated by the SA as a causative factor via contact precautions in an outbreak that took place 6 weeks earlier, known to transmit via respiratory means not contact.

89. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"3.5 During the 6:35 PM tour on 4/21/2020, the surveyors observed that on entry to the 200 unit (a unit with positive residents) neither the Administrator nor the Director of Nursing (DON) put on protective gowns and they were both observed in close proximity to staff working with residents and with residents that were in the main hallway.3.6 During the 6:35 PM tour on*

*4/2112020, the surveyors observed that on entry to the 100 Unit (a unit with positive residents) the Director of Nursing (DON) did not put on a protective gown and gloves.*" SA's failures of known duties, an observation conflated to appear as a regulation. This evidence of the failures of the SA's duties, is furthered by their own repeated argument of a need for immediate action in testimony. The SA's delay in communicating such observations of harm were not made known to the Licensee for 11 days.

90.The SA did knowingly falsely author and cause to be published the following: *"4.0 The facility failed to ensure that staff utilized personal protective equipment in a manner that met minimum standards and minimized risk for infectious spread. 4.1 During a 6:35 PM tour on 4/21/2020, the surveyors observed that on entry to the 200 unit (a unit with positive residents) neither the Administrator nor the Director of Nursing (DON) put on protective gowns and they were both observed in close proximity to staff working with residents and with residents that were in the main hallway. 4.2 During the 6:35 PM tour on 4/21/2020, the surveyors observed that on entry to the 100 Unit (a unit with positive residents), the Director of Nursing (DON) did not put on a protective gown and gloves. 4.3 On 4/21/2020 at 7:35 PM, licensed practical nurse (LPN) #12 was observed opening a door when exiting a room on a COVID positive unit closed the door, and then went up the hall to the nurses' station without changing gloves or sanitizing her hands."* The SA refuses to accept gown conservation is directed by both CDC and MDH to SF, in spite of such documentation in the evidentiary record of OAH. Instead, arguing in OAH court that PPE conservation was not meant for the current PHE but instead was meant "for times of war." This third time such was cut and pasted into the SOD.

91. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: *"4.4 On 4/21/2020 at 7:15 PM, the facility DON was observed having dropped a*

*bottle of hand sanitizer on the floor, she picked it up off the floor and placed it back in her pocket. She was not observed to perform any hand hygiene or sanitation at that time. 4.5 On 4/23/2020 at 9:00 AM, geriatric nursing assistant (GNA) #20 was observed in the care unit wearing a protective gown that was not tied and closed in the back, increasing risk for spread of the infectious agent.*" Did the SA genuinely believe that picking up a bottle of hand sanitizer was a causative factor in transmitting COVID? A single tie not tied on a GNA's gown was going to cause another infectious outbreak? These observations purported to be a causative factor for the spread of a respiratory virus by trained clinicians, trained regulators (multiples) and approved for release by legal review. There can be no immunity of privilege in the face of the absurdly unreasonable.

92. The SA did knowingly falsely publicize, charge, and prosecute based on non-factual statements: "5.0 The entirety of section (5.0)" The 5.0 section is simply the cut and paste allegations/observations made known word for word throughout the document of the SOD already, predominantly from F770 with some additional cut and paste added in from F880. The Licensee argues this was done in violation of SOM to the duties of the SA and to cause additional opportunity to repeat the many times allegations of failures are directed at the Licensee. Otherwise, the Licensee spares the reader the repetitive copy as it adds no additional current value to the complaint at large.

## IX. The Obvious and Overtly Gross Failure(s) of the Federally Required IJ Template for F770 evidencing continued Lack of Probable Cause:

93. The exhibit in OAH court MDH 45-002 is the required necessary tool demanded of CMS for the SA for an IJ determination. The below represents the material facts in the determination recorded by the SA for IJ:

*"Resident #4 was tested on 4/6 for COVID-19 as part of the facility's testing of all residents in the facility. The laboratory test resulted positive; however, the facility did not acquire this test result until 4/20/2020. The* ***resident was kept un-isolated*** *in a designated COVID 19 negative unit for 14 days. Resident #4 never received assessment and treatment from a physician related to his/her positive COVID-19 status. Resident was not placed on transmission-based precautions. The DON stated that the resident had been asymptomatic from 4/6/2020 to 4/20/2020. 4/24 at 11:20 AM: Resident had not been relocated from negative COVID-19 unit. Treatment had not been started as indicated in the progress note from 4/20 Residents on the unit were exposed for 14 days to Resident #4 via the lack of isolation and through the lack of droplet precautions on the part of healthcare workers. Review of Resident #4's medical records as of* ***4/29/2020 at 3:00 PM*** *did not reveal any new testing results or orders for any new testing to determine whether or not Resident #4 remained COVID-19. The facility's failure to follow-up on the lab results in a timely manner,* ***facilitated undue exposure of COVID-19 to other residents and staff. If immediate action*** *is not taken to follow-up on lab and diagnostic results* ***more people in the facility will be at risk."***

The SA errs on ALL allegations and recognizes such failures and by the 3rd version of the SOD, 7/2020, the entirety of the NEW reason for determining an IJ, on 4/29/2020, is the Licensee's undocumented, unrecorded alleged confession the SF had no means of tracking any of the 146 incoming labs and no system, in spite of evidentiary records otherwise. This allegation is one of the most damning to the Licensee's professional licensure and employment. The SA knew R4 was seen by the Nurse Practioner, repeatedly. The SA knew the entirety of facility was using TBP prior to entry to the campus, The SA obviously self-learns there is no capacity to re-test and that this is not the CDC protocol for determining Covid recovery (SBR), and without fact or evidence

as to any of the random observations or SA's statements as to how this is evidence of facts that R4 placed anyone at risk, the SA with reckless disregard of facts refuses to relent in their goal to cite and prosecute an IJ?

**X. Evidencing Lack of Probable Cause: The Overt Malice Targeting Licensee**

94. The SA as noted had only their concealed fabricated report to initiate the investigation of the SF. With no evidence of an IJ after 8 days of investigation the SA fabricated, an IJ. In citing F770 Lab- this deficiency quickly devolved into an allegation in need of an evidenatry rationale. And that "need" became evidence of more fraud, concealment and lack of candor in stating the Administrator/Licensee confessed to knowing regulatory non-compliance in stating the SF had no means of tracking any of the 146 labs at the facility.

Series of Events: The "Compliant" Investigation: NHA received an email on 4/22/ 2020 it had been addressed to then MD DOH Director. The email was from R4's son, the email was written as follows:

*"Yesterday we were notified that her (R4) test on 4/6/20 was actually positive. There has been no explanation. However, she has been afebrile and asymptomatic since then for 15 days. Now they are moving her to a COVID 19 unit. My question is why? She has survived an appropriate quarantine period with no symptoms. I think she should not be moved to a COVID 19 unit. What do you think?" R4 son*

95. Licensee had received this from R4 son on 4/20/2020 (a day earlier) and immediately called R4 son to affirm for him the SF was not being "misdirected" in violation of CDC by MD DOH and the SF was not moving his mother into a Covid positive room on a Covid positive unit. And that the SF License and clinical staff were in agreement on what the CDC guidance was relative

to his mother's clinical condition: in isolation since testing on 4/6, (Private room and private br. HCW in TBP and his mother (R4) remained SBR asymptomatic, more than 14 days past testing, as of 4/20/2020. There was no reason to expose his mother to a shared room on a Covid positive unit simply because the results of her testing had not been received timelier. This would not affect the basic principle for managing Covid isolation. R4's son was relieved to understand we all interpreted the CDC guidance relative to his mother's clinical condition the same, she did not require being moved. And yet there is not a single note, not a single interview by these highly trained SA investigators of interviewing Licensee. Even though R4's son wrote clearly to the SA on 4/21/2020 the matter was resolved as he spoke with the Licensee. How can such an investigation be adequate in the determination when made without material parties interviewed? Given this absolutely clear communication and accurate information, ridiculously in AP release of the SOD the MD DOH staff authored the knowing false narrative following for publication: And yet on 5/7/2020 the SA caused to be published and reason for pursuit of Licensee for three years the following:

"*After the test results for Resident #4 were received, he/she was still not relocated from the COVID negative unit for four more days, and the risk spread of the potentiality fatal illness within a vulnerable population continued to spread.*"

It should go without saying, but for clarity **R4 was of course NEVER moved off the unit.**

96. More than 24-hrs after the SA entered and greater than 48 hrs. after deciding to enter the SF, without probable cause, the SA received and documented the following evidenced fraud and later concealment. On 04/22/2020 Randa Cooper, SA Long Term Care Program Manager, received the same email addressed to then MD DOH Director. The initial and only interview with R4 son, on 04/22/2020 at 6:15 pm, authored by MD DOH staff reveals the following: "*4/22/20 at 6:15*

*PM – Program Manager spoke with R4 son. He stated that he had spoken with the facility NHA, Andrea Dwyer. States NHA agreed not to move his mother after speaking to him. ...He indicated that his mother was positive from the results initially ran on 4/6/20 and has been asymptomatic since that time, so he did not feel she should be moved. DON allegedly told him that moving her was out of the facility's control and was not their decision. She stated that MDH to the facility that they had to move the resident."*

97. In citing F770- the MD DOH staff had made multiple changing charges, but for this short version we will review a few key points some of what was publicly posted on 5/8/2020: The many failures of the SA are notable in their repeated efforts to conceal the timing of this "complaint". This can be further evidenced by simply noting the other residents cited (R1, R2) medical record reviews were performed on 4/22 by the SA's exhibits and admissions, yet R4, the IJ requiring immediacy of review by the SA, isn't initiated until 4/24/2020 (only within the required 2 day limit for the SA per the SOM if they complaint was as evidenced and clearly shown not received until 4/22/2020, after the SA entry into the SNF).

98. With each revision by the SA, the attack on the Licensee became more directed, more specific, more fraudulent. The Second SOD revised an entirely new deficiency for F835, Administration. This deficiency offered no new observations or insight findings, it simply cut and pasted from the other "regulatory failures" to paste together specific allegations against the Licensee for confessing to knowingly failing to comply with regulations.

**P. Nay Testimony on F770 Evidence of Malice**

99. Excerpt of Executive Director P. Nay's affidavit: The SA did repeatedly knowingly and falsely with malice and reckless disregard cause to be authored, published and distributed and

maliciously used abusive government power and employed an utter lack of candor with the courts: "On 4/29/2020, "*the Administrator acknowledged there was no master list or other effective process to track and ensure that results from all the critical COVID lab tests sent to the lab were reported back to the nursing home timely.*" (37) signed on 11/24/2020 by Patricia Nay under penalty of perjury."

100. The SA did repeatedly knowingly and falsely with malice and reckless disregard cause to be authored, published and distributed and maliciously used abusive government power and employed an utter lack of candor with the courts. An evidenatry fact of malice is Dr. Nay herself has stated the "Administrator" made this confession to her personally, reportedly during a later admitted non-existent fictious phone call at 6:30 PM. "Transcript OAH, Executive Director Executive Director Nay: pg. 320, 4:9 *A: I am referring back to the interview with the Administrator for this done on 4/29/2020. For the Administrator to acknowledge (inaudible) master list or other effective process to track (inaudible) results of all critical COVID lab tests sent to the lab was reported (inaudible).*"

101. The SA's ED did repeatedly knowingly and falsely with malice and reckless disregard cause to be authored, published and distributed and maliciously used abusive government power and employed an utter lack of candor with the courts: "*Transcript OAH, Executive Director Nay: pg. 320, 17:25 A: There was by the Administrator's own interview said there was no system for COVID tests. So no, I didn't ask. I don't have knowledge of previous systems that existed for previous lab results and prior circumstances (inaudible) facility for that. The actual deficiency was for the (inaudible) didn't have a system in place to track 4/6 – you're saying (inaudible) on 4/6, you're saying the lab report says they did on or about, I am estimating 127 tests that the*

*deficiency was not having a system to track this Covid test results that were done on 4/5 and 4/6."*

102. The SA's ED did knowingly and falsely with malice and reckless disregard cause to be authored, published and distributed and maliciously used abusive government power and employed an utter lack of candor with the courts: *Transcript OAH, Executive Director Nay: pg. 321, 7:9 A: No. In regard to the – the previous system, the deficiency again was failure to have a system for (inaudible) Covid test results.*

103. The SA's does repeatedly without scientific evidence or rationale repeatedly testify the transmission of Covid is caused by "pathogens jumping off clothes" a wholly unscientific and knowingly absurd not means of transmission of a respiratory virus. This is the SOC of the SA for managing a pandemic of a respiratory virus. The criticisms of the MDH by the Licensee were warranted.

**P. Nay 2 ½ Years later in Federal Court the Malicious Abuse of Process Continues w/Confessions of Perjury in OAH Court Proceedings**

104. Dr. Patrica Nay conceded she never spoke to the Licensee before, during or after the investigation and in fact she never spoke to any staff at Sagepoint. This factually correct revised testimony is in direct contradiction to her previous testimony. Transcript DAB, Executive Director Nay: pg. 266, 15:25, pg. 267, 1:2. Q: *All right. The reason I'm asking you the general questions is because in paragraph 55 of your—of your testimony, on page 11 you say based on your surveyor interview, on April 29, 2020 the Administrator admitted there was no method in place to track and ensure that results from all critical lab tests sent to the lab were reported back to the nursing home timely. Now that is pretty specific support for this citation, that is the*

*Administrator admitted on a certain date that there was no method in place to track and ensure and so forth, right? Now did you have that conversation with the Administrator?*

A: Executive Director Nay, ***No as I stated earlier, I did not talk directly to the Sagepoint staff.***

**XI. The Failures of Duty of the BENHA**

105. The BENHA conspires with OHCQ to retaliate against the Licensee.

106. The Board of Nursing Home Examiners' (BENHA)responsibilities and duties goes beyond the licensing and registration of Nursing Home Administrators (NHA). The BENHA is charged with the responsibility of evaluating whether a Licensee's professional conduct or ability to practice warrants modification, suspension, or revocation of their license. The BENHA was made aware of the allegations against Licensee in 5/2020.

107. BENHA members are required time and attention in overseeing and reviewing complaints against NHAs as licensees. When the BENHA receives a complaint about a Licensee and there is reason to believe the Licensee has committed a regulatory violation, the BENHA has the responsibility to investigate. The BENHA failed to timely initiate an investigation, the BENHA delayed the investigation until April 2022 and then simply refused to investigate.

108. The BENHA failed to perform a proper investigation first delaying without legal basis waiting for the OAH hearing, and then the OAH determination. But such exonerating determination did not result in BENHA ending the investigation on delaying the requirement to investigate the allegations made against the Licensee.

109. THE BENHA failed to interview the Licensee at ANY time during the investigation. While the BENHA investigator did scheduled a call to interview the Licensee, the call was effectively

cancelled by the BENHA investigator in 4/2022. The BENHA failed to complete any investigation of the Licensee.

110. After almost three years and the BENHA refusing to take ANY statement from the Licensee, refusing to investigate while actively continuing threatening the Licensee with an open investigation, the Licensee had legal representation inform BENHA AG to either initiate the investigation and proceed or a face legal due process challenge. While the AG Kathleen Ellis wrote back expressing no knowledge of the Licensee or the attorney (interesting given her presence at the time of the review of the charging documents for public release), the investigation was closed within two days. The licensee to this day has never had the opportunity to address the charges against her.

111. The BENHA fails to have process, policies and/or procedures required to perform proper investigation of Licensees' when reported to the state agency. The primary purpose of the BENHA is to protect citizen consumers from potential harm, not punishing licensees.

112. BENHA misinformed Licensee and her legal counsel when stating the BENHA had not received the ALJ's proposed decision from OAH, fully exonerating the SF and the Licensee. The BENHA gave no credence to the ALJ stating the Licensee was the most credible witness, not the SA.

**Charles Circuit Court Prosecution in defiance of exonerating & known Facts**

112. The Maryland Attorney General argues repeatedly in effort to maintain the knowingly failed allegations against Licensee/SF the regulatory violations and the regulator's allegations in F770 lab were always for an "ineffective system" it was the failure to have an effective system the system was ineffective.

P22:18-19 "*Clearly, what he is saying is they had a system. No one is arguing Sagepoint didn't have a system. No one is arguing Sagepoint didn't have a lab system. They did not have an effective system.*"

P.22:25, 23:1 "*No one has ever said....if you look all through the documentation, no-one is saying Sagepoint never had a system. The clearly did not have an effective system.*"

P. 24:20,21 "*..an effective system. This is a system, but not an effective one. And that's been the State's argument all along and that is the basis of the citation.*"

p. 26:24-25, 27:1 "*The survey did not say...the survey...they surveyor never said they had no system, the had nothing at all. They never said that. It is not in any documentation.*" Except it is and such is in the DAB hearing of which is a point a conversation/debate in the Circuit Court so how does the AG deny such factual material in evidence?

This is not prosecution with zeal as directed by the client MDH. This is failure of the Rules of Evidence, this is lack of candor with the court This is direct opposition to what is subject matter in this court room, And the actual facts the regulator did, even after confessing in 5/2022 DAB court to saying he admittedly never had a confession from Licensee. The unnamed regulator in these proceeding act under the direction of MDH did in DAB court states he was never given any evidence of the list. So, which is it there is no list, the exist but was list is ineffective, the list never existed? Years spent in court under investigations, and still the state can not determine from month to month from SOD to SOD from court to court exactly what are the charges of failures of regulatory compliance against the Licensee.

113. In Charles County Circuit Cout the AG asked what would the family of patient R4 say, obviously unaware such was in evidence in the case. This is exactly what R4's physician son said: "Our mother has lived at Sagepoint since March 2018, initially at Sagepoint Gardens in La Plata. She was transferred to the senior living facility January 2019. We have never been more satisfied with the quality of care and concern that has been rendered to our mother. Never has there been a moment to pause and question what they do for her. I believe that during the Covid

pandemic the care has been the best we could ever expect. From my personal experience in the health care industry, I know that this one caught the entire system off guard. No one was completely prepared and everyone learned as we could getting through it. Where I work at (redacted) Hospital in New York, policies change at a very rapid pace. I am still getting policy changes today. I continue to place all my faith and trust and confidence in the facility known as Sagepoint Senior Living Care. I encourage the committee to applaud them and encourage more in the future." Excerpt R4 son as reported to MD DOH 10/2020

**Closing**

114. The courts remain conflicted on malicious prosecution, the courts remain conflicted on qualified immunity, the courts remain conflicted on what is required to overcome summary dismissal of such defenses. (Virginia Law Review) These varying degrees of separation of the courts most often result in loss for the very limited number of Plaintiffs that even attempt to challenge the government. (Shielded by). Even the Supreme Court appears unclear which jurisdiction is proper for such abuses by government against the citizens, recently debating if such matters belong as constitutional challenges at all, as opposed to simple torts which should be addressed in civil tort actions in state courts. All this resulting in even highly educated well practiced legal professionals repeatedly failing to afford relief to the common citizen. It makes the lay person question if the legal system of which we are so irreversible committed is more capable than that of feudalist lords in which the citizen-commoner was at least granted right to seek relief if on bended knee. Malicious prosecution and qualified immunity cases, take decades, some cases exceed 20 years of legal battles. The government can win by default, delay and simply willing to refuse to relent, no matter the facts on the record. That is the case here, arrogance of collective agency determined not to "suffer unnecessary" public humiliation or their

loss of political capital. Instead, this SA simply made scapegoats of its own citizens with no regard for those consequences. It did such knowing its own status of, privilege, protections, immunity pleadings. The SA acted with the full impunity it would enjoy, having unlimited financial resources, unlimited time to challenge, unlimited legal resources and unlimited protections.

115.Where there is consistency is in two basic principles probable cause, or lack thereof and malice by a showing of fraud concealment, and/or ill will these elements clearly evidenced are prima facie showing necessary to defeat governments' claims of immunity. This case remains rare in its ability to do such, because this case unlike so many others that challenge government actions and actors, no shortage of the showing of the intent of the SA. Such clear and convincing evidence is well documented in two evidentiary court hearings, in two court transcripts, in multiple affidavits, and in the false, fictitious and fabricated evidence later discovered to have been repeatedly entered into court records. And yet these corrupted attempts by the SA to attack the Licensee, still yielded a losing verdict for the SA.

116. The Licensee has credibly and with evidence alleged statement of malice, meeting the required second element necessary for a 1983 complaint.

Exhibit A: Collective review Email All the wro


Tricia Nay DDH has accepted this invitation.

**Call re: SagePoint**

When: Wed May 6, 2020 6pm – 6:30pm Eastern time - New York

Joining info: Join with Google Meet
meet.google.com/oyo-crqj-shk

Join by phone
+1 980-858-5410 (PIN: 513010109)

More phone numbers

Calendar: michelle.pringle@maryland.gov

Who:
- michelle.pringle@maryland.gov - organizer
- tricia.nay@maryland.gov
- fran.phillips@maryland.gov
- kathleen.ellis@maryland.gov
- mike.pedone@maryland.gov

1-980-858-5410,,513010109#

Plaintiff: Andrea Dwyer
5815 Whipoorwill Dr, Deale, MD 20751
Beaunaz1510@gmail.com 4106273676

10-23-25